# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7564 | **DATE** | 7/26/2004 |
| **CASE TITLE** | Helen Montgomery vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation is hereby submitted to Judge Gottschall recommending that the District Court grant plaintiff's motion for summary judgment [25-1] or remand [25-2] and deny defendant's motion for summary judgment [27-1], remanding the case to the ALJ for further proceedings consistent with this Report and Recommendation. Specific written objections to this Report and Recommendation may be served and filed within 10 business days from the date that this order is served. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995). All matters relating to the referral of this case having been resolved, the referral is closed and the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 26 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials | 30 |
| | Mail AO 450 form. | | | |
| ✓ | Copy to judge/magistrate judge. | 2004 JUL 26 AM 10:18 | 7/26/2004 date mailed notice | |
| KF | courtroom deputy's initials | FILED-CB | KF mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

| | |
|---|---|
| HELEN L. MONTGOMERY )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, Acting )<br>Commissioner of Social Security )<br>)<br>Defendant. ) | No. 02 C 7564<br><br>Mag. Judge Michael T. Mason |

## REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Helen L. Montgomery ("Montgomery" or "plaintiff"), has brought a motion for summary judgment seeking judicial review of the final decision of defendant Barnhart, who denied Montgomery's claim for disability insurance benefits ("DIB") and Supplemental Insurance Income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 216, 223, 1614(a)(3). Defendant Barnhart has filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). The District Court has referred the matter to us and for the following reasons, we recommend that the District Court remand the case back to the ALJ for further proceedings constant with this opinion.

***Procedural History***

On February 23, 1999, Montgomery filed concurrent applications for DIB and SSI alleging a disability onset date of September 15, 1998. (R. 90-92, 351-35). The Social Security Administration ("SSA") initially denied Montgomery's applications on April 22, 1999 and Montgomery filed a timely request for a hearing. (R. 36-39, 355-58). Administrative Law Judge ("ALJ") Robert Karmgard conducted a hearing on February 17, 2000. (R. 382-459). On February 25,

30

1

2000, the ALJ ordered the case remanded to the SSA's state agency for further development of Montgomery's mental impairment. (R. 32-34). On May 19, 2000, the state agency denied Montgomery's applications. (R. 67-69, 364-66). A week later, Montgomery again filed a timely request for a hearing. (R. 70). On December 29, 2000, following a de novo hearing, ALJ Karmgard denied Montgomery's applications for disability benefits finding that Montgomery was able to perform a limited range of light work and was thus, not disabled. (R. 28.) See, 20 C.F.R. §§ 404.1567, 416.967. The Appeals Council denied Montgomery's request for review of the ALJ's decision on July 24, 2002, making the ALJ's decision the final decision of the Commissioner of Social Security. See Zurawski v. Halter, 245 F.3d 881 (7th Cir. 2001); Herron v. Shalada, 19 F.3d 329 (7th Cir. 1994).

### Plaintiff's Testimony

Montgomery was 51 years-old at the time of the alleged disability and 53 years-old when ALJ Karmgard rendered his decision. At all relevant times, Montgomery was "approaching advanced age." See 20 C.F.R. § 404.1563(d). Montgomery had a tenth grade education and prior work experience in "picking and packing" at a warehouse. (R. 127, 122). Montgomery also worked at a variety of jobs through a temporary agency. (R. 396-403).

At the hearing, Montgomery testified that her disability started on September 15, 1998, when she experienced her first blackout. (R. 394-96). She stated that she still experiences blackouts about twice a week. Id. Montgomery testified that she believes the blackouts began after she fell down basement stairs and injured her head. (R. 415). She stated that she experiences headaches two to three times a week, each lasting between 40 minutes and an hour. (R. 478). Despite medication, Montgomery experienced approximately 12 to 13 seizures in the past year, which she says prevent her from going out alone.

(R. 412). She also stated that she has daily back pain that radiates down to her knee cap. Sometimes Montgomery has to elevate her legs with two pillows to help alleviate the pain. (R. 416, 426).

## *Plaintiff's Medical Examinations*

### *Physical Impairments*

On March 25, 1999, Dr. Enacopol examined Montgomery at the request of the SSA. (R. 162-66). Montgomery complained of back pain, dizziness and shortness of breath with exercise, chest pressure, headaches, and fainting spells. (R. 162). Examination of Montgomery's muscoskeletal system revealed no evidence of deformities, swelling, or redness. (R. 164). However, Montgomery had limited motion in her lumbosacral spine, secondary to pain. *Id.* Her motor power was normal on the right side, but diminished to 4/5 on the left side, secondary to pain. (R. 165). Dr. Enacopol diagnosed Montgomery as having osteoarthritis of the back, uncontrolled hypertension, a history of heart arrhythmia, and headaches. *Id.*

On April 13, a state agency physician reviewed Montgomery's medical records and completed a physical Residual Functional Capacity ("RFC") Assessment. (R. 169-76). The doctor concluded that Montgomery could perform light work with occasional postural activities such as climbing, stooping, kneeling, and crouching. *Id.* Specifically, the doctor found that plaintiff could not lift more than twenty pounds occasionally and ten pounds frequently. She could only sit, stand and/or walk 6 hours in an 8-hour workday and her ability to push and/or pull was unlimited.

On April 28, Montgomery went to the Cook County Hospital Emergency Room ("ER") complaining of daily headaches for the past two months and two seizures the night before. (R. 180, 218-23). One month later, Dr. Dean Thomas Velis examined Montgomery at the request of the SSA. (R. 188-90).

3

Montgomery told Dr. Velis that her seizures began in March, 1999 and that her most recent seizure occurred that morning. (R. 188). Dr. Velis reported that Montgomery was overweight and her symptoms were consistent with grand mal seizures. (R. 190). However, examinations of Montgomery's back and muscoskeletal and neurological systems were normal. (R. 189-90).

A second state agency physician reviewed Montgomery's medical records and completed an RFC assessment on July 7, 1999. (R. 193-200). That doctor found that although Montgomery did not have any exertional limitations, she could never climb ladders, ropes, or scaffolds. (R. 195). The doctor also opined that due to plaintiff's seizures, she should avoid hazards like machinery and heights. The next day, Montgomery was treated in the ER for seizure activity. (R. 224).

On August 20, Montgomery went to the neurology department of the University of Illinois at Chicago ("UIC") complaining of seven episodes of lightheadedness and a possible syncope with convulsion. (R. 210-11). Montgomery admitted to head trauma as a result of being hit by her husband. (R. 210). The neurologist reported mild facial asymmetry. *Id.*

A September 21 Electroencephalograph ("EEG") revealed a mild slow wave abnormality on the left temporal area of the brain, indicating a slight neurophysiological disturbance within that region. (R. 212). However, no epileptiform discharges were detected. *Id.* A physical exam one week later was normal, but a final report from the UIC neurology department indicated epilepsy with possible complex partial seizures. (R. 208). On September 30, Montgomery went to the UIC general medicine department complaining of heart palpitations. (R. 239). The doctor indicated that the pain was not likely related to any cardiac problems. (R. 240).

On December 5, chiropractor Kevin J. Regan examined Montgomery. (R.

228-30). Dr. Regan observed that Montgomery was obese with restricted movements. (R. 228). He found sacroiliac disc displacement, lumbosacral spondylolisthesis, and facet syndrome. (R. 229). After treating Montgomery twice a week for a month, Dr. Regan noted her poor prognosis. (R. 230). Dr. Regan's report indicated that Montgomery's RFC was sub-sedentary and she suffered from seizures, hypertension, and depression. (R. 231-34).

On April 26, 2000, Dr. Margaret Stronska examined Montgomery at the request of the SSA. (R. 253-55). Upon examination, Dr. Stronska found no objective findings to explain Montgomery's pain complaints and that she was not regularly taking her seizure medication. (R. 254, 256).

On May 5, a third state agency physician completed a physical RFC. The doctor did not find any exertional limitations, but did note that plaintiff should never climb ladders, ropes or scaffolds and should avoid concentrated exposure to hazards, including machinery and heights.

One month later, Montgomery visited an orthopedic spine clinic complaining of lower back and right knee pain. (R. 304-05). An examination showed that Montgomery was neurovascularly intact, had normal reflexes and strength in her lower extremities, and had a limited range of motion in her lower back. (R. 304). X-rays revealed mild degenerative changes in her right knee and mild to moderate degenerative changes of her spine. (R. 305). Dr. Regan recommended that Montgomery schedule both an MRI and additional x-rays. *Id*. Montgomery's June 26 physical examination was normal and Dr. Daniel Heir reported that her seizures were better controlled. (R. 338).

*Mental Impairments*

On April 26, 2000, the same day Dr. Stronska conducted a physical examination, Dr. Prieto performed a psychiatric evaluation of Montgomery at the SSA's request. (R. 257-60). Montgomery was well dressed, but complained of

5

depression, nervousness, and forgetfulness. (R. 257). Montgomery also reported that her boyfriend was physically and mentally abusive, but "she [had] no place else to go." *Id.* Plaintiff stated that sometimes she wishes she were dead, but she did not have any suicidal or homicidal plans. Upon examination, Montgomery was oriented and did fairly well with immediate memory testing. (R. 259). Montgomery was diagnosed with mild reactive depression, mild generalized anxiety disorder without panic attacks, and severe marital problems. (R. 260). Dr. Prieto opined that Montgomery's prognosis was fair with treatment. *Id.*

On May 8, a state agency psychologist reviewed Montgomery's medical records and completed a mental RFC assessment. The psychologist concluded that Montgomery had the mental capacity to perform simple tasks, and had slight restrictions on her daily living activities, slight difficulties in maintaining social functioning, but seldom experienced deficiencies of concentration, persistence, or pace. (R. 281).

Dr. Rosenthal, Montgomery's treating psychiatrist, saw her on May 30 for a diagnostic evaluation. (R. 294-98). Montgomery reported that over the past few months she experienced frequent crying episodes and "a lot" of her emotional stress was related to her abusive boyfriend. (R. 294). Upon examination, Montgomery was well-groomed, cooperative, made good eye contact, and spoke at a normal rate and tone. (R. 297). Montgomery displayed a logical thought process and fair insight and judgment. *Id.* Dr. Rosenthal diagnosed Montgomery with major depression, but found that she showed improvement because of her medication and therapy sessions. (R. 298, 314). On October 6, Dr. Rosenthal opined that Montgomery would have difficulty working at a regular job on a sustained basis. (R. 349). Elaborating, he stated that "[w]ith the patient's current housing situation and finances, I think she would

have problems at a regular job. When she gets a stable housing situation, then I think a sheltered workshop with a supportive environment could help patient. Then she could be gradually streamlined into [a] regular job and have the hours increased as patient progresses."[1] *Id.*

**Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will conduct a "critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* (*quoting Steele*, 290 F.3d at 940.). The ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," however he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

**Legal Analysis**

A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has

---

[1] We quoted directly from Dr. Rosenthal's handwritten notes. Although the court believes this is an accurate transcription, at times Dr. Rosenthal's handwriting was difficult to decipher.

7

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. 423(d)(1)(A). In determining whether the claimant is disabled, the ALJ must consider the following five-step inquiry set forth in 20 C.F.R. § 416.1920(a)-(f): "(1) whether the claimant is not currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. Under this evaluation, "an affirmative answer leads either to the next step, or, on [s]teps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than [s]tep 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Zurawski*, 245 F. 3d at 886. However, if the claimant reaches step 5, "the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy." *Id.*

Steps 1 through 3 of the ALJ's analysis are not contested. ALJ Karmgard found that plaintiff was not currently gainfully employed; suffered from severe impairments including a seizure disorder, degenerative disease of the right knee and lumbar spine and depression; and that those conditions failed to meet or equal any section of the listing of impairments. At step 4, the ALJ found that Montgomery had the RFC :

> to perform the requirements of work except for: lifting/carrying up to 20 pounds more than occasionally or 10 pounds more than frequently; sitting, standing or walking, with normal breaks for more than 6 hours each in an 8-hour day; performing activities such as balancing, stooping, crouching, kneeling, and crawling more than occasionally; climbing ropes, scaffolds, and ladders; working in settings containing any respiratory irritants at concentrated levels; working with or near exposed unprotected moving parts or dangerous moving machinery; working near unprotected heights or excavations; operating a moving or motorized vehicle; understanding, remembering, and/or carrying out detailed and complex work instructions and/or tasks; and will be involuntarily off-

8

>task for as long as 15 minutes on an average of 2 unscheduled
>occasions per month. (R. 28).

ALJ Karmgard concluded that with the RFC outlined above, Montgomery could perform limited light work. He also determined that she could not perform her past relevant work, requiring him to proceed to step 5 analysis.

In evaluating plaintiff's claim at step 5, the ALJ considered the testimony of VE Radke, who opined that based on the hypotheticals the ALJ posed to him concerning plaintiff's impairments, she could perform a significant number of jobs currently existing in the economy. Specially, the VE found that plaintiff could work as a grader/sorter, maid, stock clerk or in food preparation.

### RFC Determination

First, plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. We agree. As stated above, the ALJ must "build an *accurate* and *logical* bridge from the evidence to [his] conclusion . . . ." *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (emphasis added). He must "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curium) (quoting *Stephens v. Heckler*, 776 F.2d 284, 287 (7th Cir. 1985). Accordingly, the record must contain evidence to support the ALJ's findings *and* the ALJ must articulate the basis for his findings. *Steele*, 290 F.3d at 941.

### ALJ's Stated Limitations

At step 2, ALJ Karmgard found that plaintiff suffered from, *inter alia*, the severe impairments of depression and a seizure disorder. Then, as part of his RFC determination at step 4, he concluded that plaintiff required an accommodation to be "involuntarily off-task for as long as 15 minutes on an average of 2 unscheduled occasions per month," and that she could not understand, remember, and/or carry out "detailed and complex work instructions

9

and/or tasks." (R. 21). However, the ALJ failed to specify whether these limitations were due to plaintiff's seizure disorder, a physical impairment, or her depression, a mental impairment.

The ALJ also failed to articulate the basis for his findings. Specifically, the ALJ did not cite to any evidence in the record, medical or otherwise, that supports his conclusion that plaintiff would be involuntarily off-task twice a month for up to 15 minutes. The ALJ did provide a brief synopsis of plaintiff's hearing testimony and outlined some of the medical evidence in the administrative record. However, he failed to specifically articulate the basis for his off-task conclusion. The ALJ stated that neurologist notes from September, 1999, through April, 2000 reflect reported seizures at a maximum of twice a month and that a consultative examiner noted complaints of seizures twice a month. However, he failed to build a bridge from that evidence to his conclusion. The ALJ never stated that his off-task accommodation was based on plaintiff's seizure disorder. There is also evidence in the record to support a finding that plaintiff suffers from head-aches, blackouts and dizzy spells, all of which could cause her to be off-task at work. Furthermore, the ALJ found that plaintiff was depressed, which could lead to her being off-task. We cannot guess which ailment or combination of ailments the ALJ believed would cause plaintiff to be off-task. *See Embry v. Barnhart*, 2003 WL 21704425, *8 (N.D.Ill. July 18, 2003) (if the court cannot identify the evidence the ALJ relied upon to reach his RFC determination or the reasons behind it, the ALJ has failed to build the requisite logical bridge).

The ALJ also failed to provide support for this finding that plaintiff's off-task occasions would last no more than 15 minutes. A review of his opinion does not reveal any evidence to support such a durational finding, and we cannot speculate as to the basis for that determination. Furthermore, the ALJ

10

did not provide support for his finding that Montgomery could not understand, remember, and/or carry out "detailed and complex work instructions and/or tasks." The record does contain a mental RFC assessment from an SSA doctor in which the doctor finds that Montgomery would be moderately limited in her ability to understand, remember and carry out detailed instructions. However, the ALJ failed to reference that RFC in his opinion. Accordingly, the case must be remanded to the ALJ for further elaboration as to the basis for his findings regarding plaintiff's off-task occasions and the limitations on the types of tasks or instructions she can carry out. The ALJ must specify whether these limitations are due to plaintiff's physical or mental impairments, and provide a basis for his findings as to the length and frequency of her off-task occasions.

*Dr. Rosenthal's Findings*

Next, plaintiff argues that the ALJ mischaracterized and impermissibly dismissed the findings of Dr. Rosenthal, plaintiff's treating physician. Dr. Rosenthal began treating plaintiff on a weekly basis in late May of 2000. On October 6, 2000, he completed a mental impairment questionnaire. In the questionnaire, Dr. Rosenthal found that plaintiff would have a difficult time working at a regular job on a sustained basis. (R. 349). Specifically, he opined:

> [w]ith the patient's current housing situation and finances, I think she would have problems at a regular job. When she gets a stable housing situation, then I think a sheltered workshop with a supportive environment could help patient. Then she could be gradually streamlined into [a] regular job and have the hours increased as patient progresses.[2] *Id.*

In his opinion, ALJ Karmgard misstated Dr. Rosenthal's findings. The ALJ concluded "[t]hough [Dr. Rosenthal] opines as to potential difficulty sustaining a regular job and that a sheltered work environment would help the claimant, these opinions appear to be proffered in association with the claimant's reported

---

[2] As stated *supra*, we believe this is an accurate transcription of Dr. Rosenthal's handwritten notes.

11

domestic, housing and financial circumstances." (R. 25). The ALJ apparently concluded that the work limitations Dr. Rosenthal found, namely plaintiff's need for a sheltered work environment and a gradual streamline into a regular job based on her progress, were based on her domestic, housing and financial circumstances and, therefore, not related to her depression.

The ALJ's characterization of Dr. Rosenthal's findings is not accurate. As stated above, the ALJ must not only build a logical bridge from the evidence to his conclusion, but that bridge must also be *accurate*. If the factual basis for the ALJ's conclusion is not an accurate representation of the record, the conclusion cannot be sustained. See *Embry*, 2003 WL 21704425, *7 (N.D.Ill. July 18, 2003). The ALJ's conclusion that Dr. Rosenthal's limitations were based, even in part, on plaintiff's housing situation is a misstatement. Dr. Rosenthal opined that *even after* plaintiff finds a stable housing situation, a sheltered workshop could help. He also concluded that *after* she finds a stable housing situation she could be gradually streamlined into a regular job, based on her progress. Accordingly, contrary to the ALJ's conclusion, Dr. Rosenthal's limitation could not possibly be based on plaintiff's housing situation.

Additionally, Dr. Rosenthal did not address, one way or the other, whether these limitations were related to plaintiff's mental impairments. He did specifically mention plaintiff's current housing and financial situation while omitting any mention of her depression. However, alone, that statement is not sufficient evidence for the ALJ to conclude that the doctor's findings were not based, at least in part, on plaintiff's mental impairment. See *Jarmon v. Barnhart*, 2004 WL 742080, *8 (N.D.Ill. Apr. 1, 2004) (remanding the case because the ALJ did not address plaintiff's history of psychological problems, but merely dismissed them as being secondary to his addiction disorders) (citing *Myers v. Charter*, 1997 WL116805, *13 (N.D. Ill. 1997) ("remanding the case because the

ALJ did not provide an explanation for dismissing the claimant's mental impairment claim, which, according to the district court, meant that the ALJ made an impermissible medical determination").

Further, "[m]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's condition and circumstances." Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ cannot simply disregard the findings of plaintiff's treating physician by concluding that they are a result of her domestic, housing and financial situation, rather than her mental impairments. The ALJ correctly noted that Dr. Rosenthal found Montgomery's functional limitations to be relatively slight, noting that the restrictions on Montgomery's daily activities and her ability to maintain social functioning were slight and that she would seldom have deficiencies in concentration, persistence and pace. However, those functional limitation findings do not provide sufficient support for disregarding Dr. Rosenthal's conclusion that Montgomery would have a difficult time working at a regular job on a sustained basis and would benefit from a sheltered workshop.

According to the VE, had the ALJ concluded that based on plaintiff's functional limitations she required a sheltered workshop, she could not work as a grader/sorter, maid, stock clerk or in food preparation, the jobs the ALJ ultimately found that she could perform at step 5 of his analysis. In fact, the VE found that a sheltered workshop requirement would essentially eliminate the entire unskilled, competitive work base. Because, if adopted, the findings of plaintiff's treating physician could affect the ALJ's ultimate conclusion that plaintiff was not disabled under the Act, on remand the ALJ should better articulate the basis for his decision to disregard Dr. Rosenthal's finding that plaintiff could benefit from a sheltered workshop.

In addition to finding that plaintiff would have difficulty working at a regular

13

job, Dr. Rosenthal also found that Montgomery suffered from sleep and mood disturbances, emotional liability, pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, oddities of thought and perception, perceptual disturbances, decreased energy, and pathological dependence or passivity. Further, contrary to the ALJ's finding, Dr. Rosenthal noted Montgomery experienced recurrent panic attacks. (R. 347) Based on this evidence, the ALJ did not adequately support his decision to disregard parts of the mental impairment questionnaire Dr. Rosenthal completed and his finding that "significant and debilitating limitations [did] not appear to arise out of [plaintiff's] mental impairment itself." On remand, the ALJ must better articulate the basis for his findings regarding the functional limitations, if any, arising from plaintiff's mental impairments.

## *Medical Expert Consultation*

Plaintiff also argues that the ALJ committed legal error in failing to obtain the opinion of a medical expert to aid in evaluating the evidence in the record. Montgomery contends that in a complex case such as this, with a number of impairments, a medical expert's testimony is necessary. She further argues that because the ALJ failed to obtain such testimony, he was relying on his own opinion and playing amateur doctor, which constitutes legal error. As stated above, the ALJ did not provide a logical bridge from the evidence in the record to his conclusion that plaintiff's impairments would result in her being off-task no more than fifteen minutes twice a month. Now, plaintiff argues that in order to build that bridge, the ALJ needed the assistance of a medical expert, and without such assistance, his findings amount to a "hunch" and "rank conjecture." *See Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995).

We agree with plaintiff that this is a complex case, and based on the evidence in the record, the ALJ could have benefitted from the testimony of a

14

medical expert. See Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000). The ALJ found that plaintiff had both physical and mental impairments that limited her ability to work. However, there was no medical evidence in the record addressing the relationship of those impairments and their combined effect on plaintiff's ability to work. Additionally, the ALJ disregarded some of the findings of plaintiff's treating physician, Dr. Rosenthal. Then, on his own, the ALJ concluded that plaintiff's mental and physical impairments would not cause her to be off-task more than 15 minutes twice a month. This is a hunch and conjecture, which is not allowed and necessitates a remand. On remand, the ALJ should consult a medical expert to ascertain what functional limitations plaintiff's combined impairments impose.

### Credibility Determination

Finally, in her reply brief, plaintiff agues that the ALJ failed to adequately support his finding that plaintiff's hearing testimony was not "fully credible." We need not address plaintiff's credibility argument because it was raised for the first time in her reply brief. Arguments raised for the first time in a reply brief are waived. See Campbell v. Shalala, 988 F.2d 741, 745 n.3 (7th Cir. 1993), see also Reynolds v. East Dyer development Co., 882 F.2d 1249, 1253 n.2 (7th Cir. 1989).

### Conclusion

Because the ALJ failed to articulate the basis for his findings, the court cannot provide a meaningful review of the ALJ's ultimate conclusion that Montgomery is not disabled. Accordingly, we recommend that the District Court GRANT plaintiff's motion for summary judgment and DENY defendant's motion, remanding the case to the ALJ for further proceedings consistent with this opinion. Having said that, it is also important to note that, at the end of the day the ALJ may be correct about the extent of plaintiff's disability and she may not

15

be entitled to benefits. However, we cannot sustain that conclusion based on the record before us.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

*[signature: Michael T. Mason]*

**MICHAEL T. MASON**
**United States Magistrate Judge**

Dated: July 26, 2004